NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0185n.06
Filed: March 9, 2007

No. 06-3350

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KIM BENNETT, | ) | |
| | ) | |
| *Respondent-Appellant*, | ) | ON APPEAL FROM AN |
| | ) | ORDER OF THE SECRETARY, |
| v. | ) | UNITED STATES |
| | ) | DEPARTMENT OF |
| UNITED STATES DEPARTMENT OF | ) | AGRICULTURE |
| AGRICULTURE, | ) | |
| | ) | **OPINION** |
| *Petitioner-Appellee.* | ) | |

BEFORE:     KEITH and McKEAGUE, Circuit Judges; and CLELAND, District Judge.[*]

**McKEAGUE, Circuit Judge.**  Appellant Kim Bennett ("Bennett") appeals a decision of the Secretary of Agriculture (the "Secretary") finding him in violation of the Horse Protection Act. For the reasons that follow, we affirm the decision of the Secretary.

## I. BACKGROUND

Bennett has trained and bred Tennessee Walking Horses since 1980. He has a AAA judge's license with the National Horse Show Commission, and a trainer's license with the Walkers Training Association, both in good standing. Bennett and his wife, who is also a licensed trainer and judge, advised some acquaintances, not parties to this case, to purchase The Duck, and in 2002 the Bennetts

_____

[*]Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

began training The Duck. The Duck is a stallion and a previous world grand champion, and Bennett's goal was to prepare The Duck to win another championship at the 64th Annual Tennessee Walking Horse National Celebration Show in Shelbyville, Tennessee in August of 2002.

On August 26, 2002, Bennett entered The Duck as a contender in the competition at the Celebration that day. As a breeding stallion, The Duck had a nervous temperament; he did not like strangers and was easily excited when around other horses. Therefore, Bennett, who was to ride The Duck in the competition, waited until the horse inspection area was empty of other horses before bringing The Duck to be inspected. Mark Thomas, a "designated qualified person" licensed to inspect horses for violation of the federal Horse Protection Act and employed by the privately-run National Horse Show Commission, conducted a pre-show inspection of The Duck to determine whether The Duck had been illegally "sored" to enhance his gait. Thomas gave The Duck the highest possible score for his general appearance, his locomotion, and his reaction to palpation. The Duck was approved for exhibition, and Bennett led him to the warm-up area.

On his way to the warm-up area, Bennett was stopped by Dr. Michael Guedron, a United States Department of Agriculture ("USDA") veterinarian authorized by the Secretary to inspect horses for violations of the Horse Protection Act. Dr. Guedron displayed appropriate credentials indicating this authority, of which Bennett was also previously aware. Dr. Guedron told Bennett to return The Duck to the inspection area for a second inspection; he did not volunteer an explanation for this instruction, nor provide one when Bennett asked. Bennett complied initially, but when he observed Dr. Guedron palpating The Duck's left front pastern in a manner Bennett believed to be intended to provoke a "sore" response from a horse that was not sore, he led The Duck away from

Dr. Guedron. Dr. Guedron asked whether Bennett were refusing inspection; he responded, "No, I'm not. I'm just asking that you inspect the horse properly." Tr. at 216.

Also present was Dr. Lynn Bourgeois, another USDA veterinary medical officer. Dr. Bourgeois was also the "show veterinarian," meaning that he was the veterinarian in charge of the show, and was responsible to oversee Dr. Guedron, other federal inspectors, and the designated qualified persons. Dr. Bourgeois asked Bennett whether he would allow Dr. Guedron to finish the inspection. Bennett replied, "Not Dr. Guedron." Tr. at 160. Bennett requested that Dr. Bourgeois inspect the horse himself, but Dr. Bourgeois would not. Bennett never agreed to allow Dr. Guedron to complete the inspection, and eventually everyone left; The Duck did not compete.

The USDA took no further action regarding this incident until April 13, 2004, when an administrator for the Animal and Plant Health Inspection Service (the "APHIS") filed a complaint under the Horse Protection Act, 15 U.S.C. §§ 1821-1831, with the Secretary. The complaint alleged that Bennett had refused to allow a representative of the Secretary to inspect The Duck, in violation of 15 U.S.C. §§ 1824(9), 1823(e). The Administrative Law Judge ("ALJ") before whom the case was argued found that the USDA had not met its burden of proving a violation of the Horse Protection Act by a preponderance of the evidence because it had not shown that Dr. Guedron's inspection was performed "in a reasonable manner." ALJ Opinion at 10-11.

The USDA appealed the ALJ's decision to a Judicial Officer of the Secretary. The Judicial Officer reversed the ALJ, finding Bennett's belief that Dr. Guedron was performing his inspection unreasonably "not relevant" to the question of whether Bennett violated 15 U.S.C. § 1824(9). Opinion of Secretary at 17. The Judicial Officer found that Bennett had refused to allow Dr.

Guedron to inspect The Duck, and therefore decided there had been a violation of the Horse Protection Act. Opinion of Secretary at 19-20. The Judicial Officer therefore ordered Bennett to pay a $2,200 fine, and disqualified him for one year from "showing, exhibiting, or entering any horse, directly or indirectly through any agent, employee, or device, and from managing, judging, or otherwise participating in any horse show, horse exhibition, horse sale, or horse auction." Opinion of Secretary at 23, 27. Bennett now appeals that decision.

## II. REFUSAL OF AN UNREASONABLE INSPECTION

"[C]ourts are to 'give substantial deference to an agency's interpretation of its own regulations.'" *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).[1] The Secretary's[2] interpretation may be overturned "if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,'" but "if 'it is a reasonable regulatory interpretation we must defer to it.'" *Id.* at 944 (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512; *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 94-95 (1995)).

---

[1]Both the USDA here and the Tenth Circuit in *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999), which the USDA quotes, inaccurately claim that the Supreme Court's opinion in *Thomas Jefferson University* holds that courts defer to agency interpretations of *both* the statutes *and* regulations they administer. *Thomas Jefferson University* refers only to the interpretations of regulations. A federal agency's interpretation of statutes is subject to a less deferential standard, as set forth below.

[2]The Judicial Officer "serves as the delegate for the Secretary of Agriculture for judicial matters, and has final administrative authority to decide the Department's [USDA's] cases . . . ." *Rowland v. USDA*, 43 F.3d 1112, 1114 (6th Cir. 1995) (citing 7 C.F.R. § 2.35).

Regarding statutes, however, courts give less deference to an agency's interpretation. To "assess[] an agency's construction of a statute that it administers," courts perform the two-part analysis set forth in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Harris v. Olszewski*, 442 F.3d 456, 466 (6th Cir. 2006). That analysis inquires: (1) "has Congress 'directly spoken to the precise question at issue?'" and (2) "is 'the agency's answer [] based on a permissible construction of the statute?'" *Id.* (alteration in original) (quoting *Chevron*, 467 U.S. at 842-43).

The Horse Protection Act prohibits "[t]he failure or refusal to permit access to or copying of records, or the failure or refusal to permit entry or inspection, as required by [15 U.S.C. § 1823]." 15 U.S.C. § 1824(9). This "inspection" is explained in § 1823:

> [T]he Secretary [of Agriculture], or any representative of the Secretary duly designated by the Secretary, may inspect any horse show, horse exhibition, or horse sale or auction or any horse at any such show, exhibition, sale, or auction. . . . Each such inspection shall be commenced and completed with reasonable promptness and shall be conducted within reasonable limits and in a reasonable manner.

*Id.* § 1823(e). The Department of Agriculture's regulations further provide:

> Each horse owner, exhibitor, trainer, or other person having custody of, or responsibility for, any horse at any horse show, horse exhibition, or horse sale or auction, shall allow any APHIS representative to reasonably inspect such horse at all reasonable times and places the APHIS representative may designate. . . . APHIS representatives will not generally or routinely delay or interrupt actual individual classes or performances at horse shows, horse exhibitions, or horse sales or auctions for the purpose of examining horses, but they may do so in extraordinary situations . . . .

9 C.F.R. § 11.4(a).

Both the statute and the regulation address the "reasonableness" of an inspection. The statute requires "*reasonable* promptness," "*reasonable* limits," and a "*reasonable* manner," and the regulation states that USDA officials will "*reasonably* inspect" at "*reasonable* times and places." However, neither expressly provides that a trainer or owner may refuse inspection due to a lack of such reasonableness. The Judicial Officer's opinion does not expressly address the regulation. It does explain his interpretation of the statute's reasonableness requirements:

> The failure of a representative of the Secretary of Agriculture to conduct an inspection in a reasonable manner, as required by section 4(e) of the Horse Protection Act (15 U.S.C. § 1823(e)), may be used to challenge the results of the inspection, but may not be used as a basis to refuse to permit completion of the inspection or as a basis to require inspection by another representative of the Secretary of Agriculture.

Opinion of Secretary at 17-18.

At oral argument, the USDA conceded that there might exist extreme circumstances under which a trainer or exhibitor could refuse an inspection due to its unreasonableness without violating § 1824(9). Thus, the court is not presented with the question of whether it would ever be permissible for an exhibitor to refuse an inspection because it was unreasonable. The court need only decide whether, in this case, Bennett's refusal of an inspection he believed to be unreasonable was a violation of the Horse Protection Act.

Because the statute itself does not specify whether the "reasonableness" language provides a basis for owners and trainers to refuse inspection, Congress has not "directly spoken to the precise question at issue" in this case, the first question under the *Chevron* analysis. The second *Chevron* question is whether the USDA's interpretation is "based on a permissible construction of the statute." *Harris* explains that "[i]f so and if Congress has given the agency authority to interpret the

statute, a federal court will defer to the agency's interpretation." 442 F.3d at 466 (citing *Chevron*, 467 U.S. at 842-43).

The Supreme Court explained in *Smiley v. Citibank*, 517 U.S. 735, 740-41 (1996), that "[w]e accord deference to agencies under *Chevron* . . . because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." Thus, even if the statutory "gap for the agency to fill," and the attendant "delegation of authority" for the agency to interpret the statute, are "implicit rather than explicit," "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 843-44.

In this case, § 1823(e) makes clear that the inspection required by § 1824(9) is to be carried out by the Secretary of Agriculture or his representative. Thus, the inspection described in § 1824(9) is implemented by the USDA, and under *Chevron*, the USDA properly should resolve the ambiguity in § 1824(9). Thus, provided the Judicial Officer's interpretation of the statute is "permissible," the panel should defer to his interpretation. *Harris*, 442 F.3d at 466; *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.").

The Judicial Officer determined that Bennett's "belief that Dr. Guedron was not conducting the inspection in a reasonable manner and [Bennett's] request for inspection by" Dr. Bourgeois "are not relevant to [Bennett's] violation of . . . the Horse Protection Act," which position the USDA maintains on appeal. Opinion of Secretary at 17. This interpretation is reasonable. As the USDA points out in its brief, this interpretation furthers the purposes of the Horse Protection Act. Permitting a trainer or owner to refuse inspection based on his own assertion that an inspection is unreasonable, in the absence of circumstances "well outside the norm of regularity in the inspection process" to which the USDA referred at oral argument,[3] would potentially allow trainers to avoid discovery of "soring," the prevention of which is the purpose of the Horse Protection Act. 15 U.S.C. § 1822. Because § 1824(9) does not explicitly state the consequences of the requirement than an inspection be reasonable, and because the USDA's interpretation of the reasonableness language is permissible, this court must accept the USDA's determination that an exhibitor violates the Horse Protection Act if he refuses an inspection that is not egregious, based on his subjective belief that the inspection is unreasonable.

## III. SUBSTANTIAL EVIDENCE

This court "review[s] an administrative decision of the [Secretary] under the [Horse Protection Act] to determine whether the proper legal standards were employed and substantial evidence supports the decision." *Bobo v. USDA*, 52 F.3d 1406, 1410 (6th Cir. 1995) (internal

---

[3]The USDA conceded at oral argument that if, for example, a USDA veterinarian "start[ed] towards the horse's hoof" with "a big knife," and the owner therefore led the horse away from the inspection, the owner would not have violated § 1824(9).

quotations omitted) (second and third alterations in original) (quoting *Gray v. USDA*, 39 F.3d 670, 675 (6th Cir. 1994)). "Substantial evidence means 'more than a scintilla but less than a preponderance' of the evidence," and "'must be based upon the record taken as a whole.'" *Id.* (quoting *Elliott v. Administrator, Animal & Plant Health Inspection Serv.*, 990 F.2d 140, 144 (4th Cir. 1993); *Gray*, 39 F.3d at 675).

Unlike a federal court, a Judicial Officer, "sitting in review of an ALJ's initial decision, is authorized by statute to substitute [his] judgment for that of the ALJ." *Parchman v. USDA*, 852 F.2d 858, 860 n.1 (6th Cir. 1988) (quoting *Farrow v. USDA*, 760 F.2d 211, 213 (8th Cir. 1985)) (internal quotations omitted). However, where findings of fact are based on determinations of witness credibility, the ALJ's findings are given greater weight. *Rowland v. USDA*, 43 F.3d 1112, 1114 (6th Cir. 1995).

The Horse Protection Act, as noted above, prohibits the "refusal to permit . . . inspection" of a horse in an exhibition. 15 U.S.C. § 1824(9). As § 1823(e) clarifies, this is an inspection by "the Secretary, or any representative of the Secretary duly designated by the Secretary," provided he "present[] appropriate credentials." It is not disputed here that Dr. Guedron possessed and presented the appropriate credentials, or that he was a duly designated representative of the Secretary of Agriculture. Bennett argues that he "never refused to allow Dr. Guedron to inspect the horse. . . . Bennett's only request was that the USDA conduct its inspection reasonably and properly under direction of the H[orse] P[rotection] A[ct]." Appellant's Brief at 19.

However, this contention reflects only some of what happened. As Bennett acknowledges in his own statement of facts, he was first asked by Dr. Guedron whether he was refusing an

inspection; he responded, "No, I am not. I am only asking that you inspect the horse properly." Tr. at 316, *quoted in* Appellant's Brief at 10. When Dr. Bourgeois, the show vet, then "asked Bennett whether he would allow Dr. Guedron to complete his inspection of the horse[,] Bennett replied, 'Not Dr. Guedron.'" *Id.* Thus, Bennett himself admits that he expressly refused to allow Dr. Guedron to inspect The Duck. The true focus of his argument is that he "never refused Dr. Guedron the opportunity to *reasonably* inspect the horse." Appellant's Brief at 22.

As discussed above, the Judicial Officer permissibly concluded that the exhibitor's belief regarding the reasonableness of an inspection under such circumstances as existed here is not relevant to the question of whether a trainer has refused the inspection. Thus, by stating that Dr. Guedron was not permitted to inspect The Duck, even though he invited Dr. Bourgeois to inspect him, Bennett refused to allow a duly appointed representative of the Secretary to inspect a horse, in violation of the Horse Protection Act.

Even if Bennett had not conceded that he would not allow Dr. Guedron to inspect The Duck, "upon the record taken as a whole," there was substantial evidence that he refused inspection. Dr. Bourgeois, the show vet, testified that Bennett would not allow Dr. Guedron to inspect The Duck. Mark Thomas, the designated qualified person who initially inspected (and passed) The Duck, testified, "I just saw that Dr. Guedron started his inspection and things didn't go to suit Mr. Bennett." Tr. at 55. When asked whether Bennett allowed Dr. Guedron to inspect The Duck, Thomas responded, "Not while I was there." Tr. at 58. Lonnie Messick, an official of the National Horse Show Commission who was videotaping inspections on August 26, 2002, testified that Bennett would not allow Dr. Guedron to finish inspecting The Duck. Additionally, Leigh Bennett (Kim

Bennett's wife) testified that Bennett told Dr. Guedron that "if he could not inspect him properly, that he [Bennett] didn't want him [Dr. Guedron] to inspect him [The Duck]." Tr. at 370. Similarly, Bennett testified that "I refused him [Dr. Guedron] to inspect him [The Duck] improperly." Tr. at 458.

Thus, the record indicates that substantial evidence supported the Judicial Officer's conclusion that Bennett refused to allow Dr. Guedron to complete his inspection of The Duck. Substantial evidence need not even be a "preponderance" of the evidence. *Bobo*, 52 F.3d at 410. Here, five eyewitnesses agree that Bennett would not allow Dr. Guedron to inspect The Duck. Bennett and his wife were both careful to say that Bennett would not allow the inspection *unless* Dr. Guedron would conduct it "properly." Clearly, Bennett's position is that he objected to Dr. Guedron's inspection only because it was being conducted improperly. However, even Bennett and his wife do not claim that Bennett allowed Dr. Guedron to inspect the horse.

Bennett also argues that the ALJ's determinations should be given particular weight because they are based on credibility determinations. Bennett is correct that the factfindings of an ALJ are given greater weight when they are based on credibility determinations. In this case, the ALJ's opinion states in so many words that "I found Kim Bennett to be a credible witness." ALJ Opinion at 9.

However, the Judicial Officer's reversal was not based on his disagreement with the ALJ's findings of fact. Both the ALJ's and Judicial Officer's opinions found that Bennett was willing to have The Duck inspected as long as Dr. Guedron did not perform the inspection. ALJ Opinion at

8; Opinion of Secretary at 15. Thus, the fact that credibility-based factfindings of ALJs are given greater weight does not undermine the decision of the Judicial Officer in this case.

Bennett also argues that the USDA's decision not to offer evidence from Dr. Guedron himself leads to an adverse inference regarding what such evidence would have shown. This adverse inference arises in the Sixth Circuit under the so-called "missing witness rule" when a party fails to call a witness "peculiarly within [his] power to produce" and whose testimony would "elucidate the transaction." *United States v. Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973) (quoting *Wynn v. United States*, 397 F.2d 621, 625 (D.C. Cir. 1967)) (internal quotations omitted) (alteration in original).[4]

At the time of the proceedings below, Dr. Guedron had left the USDA. Even assuming that he was a witness peculiarly within the USDA's power to produce, the adverse inference is not helpful to Bennett. Bennett's principal contention throughout has been that Dr. Guedron was inspecting The Duck in an unreasonable manner. The ALJ found that the inspection was unreasonable; the USDA maintains that reasonableness was irrelevant in this case. Thus, had Dr. Guedron admitted on the stand that his inspection was unreasonable, the case would not be altered. Bennett's case does not fail for lack of evidence regarding Dr. Guedron's method of inspection, but because the USDA interprets § 1824(9) as requiring an exhibitor to permit inspection, even if he believes it to be unreasonable, under such circumstances as existed here. Even granting Bennett

---

[4]The Secretary of Agriculture has also invoked this rule in proceedings under the Horse Protection Act. *In re David Tracy Bradshaw*, 59 Agric. Dec. 228, 2000 WL 799108, at *16 (June 14, 2000) ("A party's failure to produce a witness, when it would be natural for that party to produce that witness, if the facts known by the witness had been favorable, serves to indicate, as a natural inference, that the party fears to produce the witness. . . . This principle has been followed in many proceedings before the United States Department of Agriculture . . . .").

every inference in his favor, the Judicial Officer's determination that Bennett violated the inspection

requirement of the Horse Protection Act is supported by substantial evidence.

## IV.  CONCLUSION

For these reasons, the Judicial Officer's decision that Bennett violated the Horse Protection

Act is **AFFIRMED**.