PRISCILLA R. OWEN, Circuit Judge,
dissenting:
I respectfully dissent because the majority opinion conflicts with the Supreme Court’s decision in O’Bannon v. Town Court Nursing Center, which held that a Medicaid beneficiary does not have a right based on 42 U.S.C. § 1396a(a)(23) to challenge the merits of a State’s assertion that a provider of Medicaid services is no longer qualified to provide Medicaid services or to challenge the State’s termination of a provider’s Medicaid agreements on the basis of the provider’s noncompliance with state and federal regulatory requirements.[1] In O’Bannon, the Court held that § 1396a(a)(23) did not give Medicaid patients a right to litigate whether a provider was “qualified” within the meaning of that statute.[2] The majority opinion in the present case holds just the opposite, and none of the bases on which it attempts to distinguish O’Bannon withstands scrutiny.
In the case before our court, the Secretary of the Louisiana Department of Health and Hospitals (LDHH) gave notice that it intended to terminate the Medicaid provider agreements of Planned Parenthood Gulf Coast, Inc. (PPGC), asserting as its reasons for termination, in part, PPGC’s settlement of a federal False Claims Act suit; provider audits regarding false claims; another pending federal False Claims Act suit in which the federal district court had stated that the Complaint’s allegations in that case “allow[ ] the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims”; misrepresentations; and a pending investigation into PPGC’s conduct. PPGC did not avail itself of state administrative or judicial proceedings to contest any of these grounds, though avenues for such a contest existed. Instead, PPGC and three of its patients sued in federal district court to set aside the proposed terminations. PPGC’s claims, asserting Equal Protection and other constitutional violations, were not the basis for the preliminary injunction the district court granted staying the terminations and are not the subject of this interlocutory appeal. The only question before this panel is whether PPGC’s patients have a right to challenge LDHH’s determination that PPGC is not a “qualified” provider. The majority opinion concludes that the so-called “free-choiee-of-provider” provision in § 1396a(a)(23) confers such a right upon Medicaid beneficiaries, contrary to the holding in O’Bannon.
If and when PPGC successfully challenges LDHH’s determination that PPGC is no longer a qualified provider, then PPGC’s patients may sue to vindicate rights granted by § 1396a(a)(23). But PPGC has not yet made such a showing.
I
Three of PPGC’s patients, Doe #1, Doe #2, and Doe #3 (the “Individual Plaintiffs”), who are recipients of Medicaid ben *474 efits, contend that LDHH lacked any legitimate basis for terminating PPGC’s Medicaid provider agreements and that PPGC is a “qualified” provider of Medicaid services within the meaning of 42 U.S.C. § 1396a(a)(23). The Individual Plaintiffs have brought an action under 42 U.S.C. § 1988. The federal district court considered only the Individual Plaintiffs’ claims in granting the preliminary injunction that is at issue in the interlocutory appeal before our court. The Individual Plaintiffs do not have a § 1983 cause of action unless there has been a violation of a federal constitutional or statutory right.
I agree that § 1396a(a)(23), which is set forth in the margin,[3] provides a right upon which a Medicaid patient may base a suit under § 1983 when she has been denied access to a provider that a State has determined meets all state and federal Medicaid requirements and qualifications. However, § 1396a(a)(23) does not give a patient the right to contest a State’s determination that a provider is not “qualified” to provide Medicaid services or a determination'that file provider has not otherwise met state or federal statutory requirements. The Supreme Court’s decision in O’Bannon makes this clear.
The question in O’Bannon was whether residents of a nursing home had a “constitutional right to participate in ... revocation proceedings,” in which a federal entity and a state entity sought to revoke the nursing home’s authority to provide care to Medicaid recipients.[4] The Court held that the recipients did not have such a right.[5] The Court’s due process analysis required it to decide what substantive rights 42 U.S.C. § 1396a(a)(23) bestows upon Medicaid beneficiaries. The Court concluded that this provision “gives [Medicaid] recipients the right to choose among a range of qualified providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified.”[6] However, the Court then said, “[b]ut it clearly does not confer a right on a recipient to enter an unqualified *475 home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified.”[7] The nursing home residents had contended that they “were entitled to an evidentiary hearing on the merits of the decertification decision before the Medicaid payments were discontinued.”[8] In denying this relief, the Court explained “decertification does not reduce or terminate a patient’s financial assistance, but merely requires him to use it for care at a different facility.”[9] Because the patients had no substantive right to demand care from a provider that had been decertified, they had no due process rights to participate in a hearing regarding certification or decertification of the provider.[10]
The decision in O’Bannon controls here. Medicaid patients do not have rights under 42 U.S.C. § 1396a(a)(23) that permit them to sue, under § 1983, to contest the merits of LDHH’s allegations supporting the proposed termination of PPGC’s Medicaid provider agreements.
II
The majority opinion attempts to distinguish O’Bannon on various grounds. But none of those grounds are valid.
A
The majority opinion states that O’Ban-non “is inapposite” because “[tjhere, the patient-plaintiffs’ injuries were alleged to stem from a deprivation of due process rights” and that “[i]n contrast, the Individual Plaintiffs here assert the violation of a substantive right.” [11] These statements reflect a failure to appreciate that there is no right to due process unless there is a substantive right that may be vindicated if adequate process is accorded. The Supreme Court concluded in O’Bannon that when a State declares that a particular provider is not qualified to provide Medicaid services, a Medicaid recipient has no “life, liberty, or property” interest arising from 42 U.S.C. § 1396a(a)(23) that is affected.[12] The Due Process Clause does not confer a “right to a hearing” in the abstract; rather, it does so only as a prerequisite to a deprivation of “life, liberty, or property.”[13] Before a plaintiff can prevail on a due process claim, she must show that a liberty or property interest exists and that the State has interfered with that interest.[14]
Though the Medicaid recipients in O’Bannon claimed that they were “entitled to an evidentiary hearing on the merits of the decertification decision,”[15] they *476 were first required to show that the State had deprived them of a “liberty or property interest”[16] by terminating reimbursement agreements with their preferred Medicaid provider.[17] The recipients identified 42 U.S.C. § 1396a(a)(23) as a source of a substantive liberty or property interest.[18] The Supreme Court therefore examined whether § 1396a(a)(23) gives recipients a right to demand care from a particular provider when that provider had been decertified as a Medicaid provider. The Court concluded that recipients do not have such a right.[19] The Court characterized the recipients’ argument as claiming that § 1396a(a)(23) “give[s] them a property right to remain in the home of their choice.”[20] In rejecting that claim, the Court explained that although Medicaid recipients have a “right to continued benefits to pay for care in the qualified institution of [their] choice,” they have “no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified.” [21] In the present case, the majority opinion is plainly mistaken in characterizing the O’Bannon decision as dealing only with “due process,” but not substantive, rights under 42 U.S.C. § 1396a(a)(23).[22]
B
1
The majority opinion says “[t]his case is different” from O’Bannon because “Louisiana has never complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC’s entitlement to render medical services to the general population, for example, by revoking its license.”[23] The majority opinion concludes that “this distinction ... makes O’Bannon fully inapplicable.”[24] As discussed below,[25] O’Ban-non’s analysis of Medicaid beneficiaries’ rights under 42 U.S.C. § 1396a(a)(23) did not turn on whether the State revoked the nursing home’s authorization to continue functioning as a nursing home. But before O’Bannon is examined on that score, it is important to understand that the majority opinion’s interpretation of § 1396a(a)(23) finds no support in its text and conflicts with the Government’s understanding of when, based on § 1396a(a)(23), Medicaid patients can and cannot sue to challenge termination of a Medicaid provider’s agreement.
The majority opinion concludes that whenever a State terminates a provider’s Medicaid agreement, regardless of the grounds for termination, a patient may sue *477 to contest the termination, unless the State also precludes the provider from providing services or care to all patients, not just Medicaid recipients.[26] This construction of § 1396a(a)(23) is plainly mistaken. Under federal statutory and regulatory provisions, a State may terminate a provider’s Medicaid agreement on many grounds, and it is not a prerequisite for such terminations that the State preclude a provider from providing services to any and all patients.
Subsection 1396a(p)(1) provides that “[i]n addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan ... for any reason for which the Secretary could exclude the individual or entity from participation in a program under subchapter XVIII of this chapter under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title.”[27] A State may terminate a provider’s agreement for many reasons even though the State does not seek to prohibit a provider from providing health care to the “general population” or to “revoke[e] its license.”[28]
The United States Government does not agree with the majority opinion’s assertion that O’Bannon is limited to situations in which a State seeks to prevent a provider from treating or providing services to all patients, not just Medicaid patients. The Government has filed an amicus brief in this case that sets forth a number of grounds on which a State may terminate a provider’s agreement.[29] Termination can occur because of, among other acts or omissions,[30] a provider’s excessive charges;[31] fraud, kickbacks, or other prohibited activities;[32] failure to provide information;[33] failure to grant immediate access under specified circumstances;[34] default on *478 loan or scholarship obligations;[35] or false statements or material misrepresentations of fact in certain circumstances.[36] The Government acknowledges that a patient has no right under § 1396a(a)(23) on which to base a § 1983 suit challenging a provider’s termination on any of these grounds. But the majority opinion appears to limit O’Bannon’s application more narrowly than the Government advocates.
The majority opinion says that it “makes sense” that patients cannot “freely intervene in state enforcement actions against facilities that violate health and safety standards.”[37] Why, then, does it “make[ ] sense” to allow patients to “intervene” “freely” when a State asserts, as LDHH asserted, that its basis for termination is that a Medicaid provider has engaged in submitting false claims for services that were never provided and for medically unnecessary services or items, in violation of federal regulations?[38]
2
In the present case, the majority opinion says that PPGC’s Medicaid patients who have sued LDHH are not “challenging ‘the merits of ” its decision to terminate PPGC’s Medicaid provider agreements.[39] Yet, some of the grounds LDHH gave for termination at least facially pertain to PPGC’s qualifications to continue as a Medicaid provider, and the Individual Plaintiffs do in fact contend that, when examined on their merits, none of those grounds is an adequate basis for termination. The majority opinion agrees, concluding that-since the Individual Plaintiffs will likely prevail on their contention that PPGC is a qualified provider, the Individual Plaintiffs have the right to sue to obtain Medicaid services from that qualified provider. This reasoning is circular, and it permits Medicaid recipients to do precisely what O’Bannon said they have no statutory right to do. The Supreme Court held in O’Bannon that Medicaid patients cannot challenge the merits of whether a provider is a qualified Medicaid provider.
The majority opinion relatedly says, “[wjhen, as here, a state terminates only a Medicaid provider agreement, independent of any action to enforce statutory and regulatory standards, O’Bannon is inappo-site.”[40] But LDHH’s notice of intent to terminate PPGC’s provider agreements did assert acts or omissions that would come within prohibitions in the federal statutory and regulatory scheme.
The majority opinion recognizes that “States may ... exclude providers on the grounds provided by 42 U.S.C. § 1396a(p)(1) and on analogous state law grounds relating to a provider’s qualification,” [41] though apparently the opinion adds the additional qualification that a State may not terminate a provider’s Medicaid agreement unless the State also precludes the provider from providing services to patients, generally,[42] as already *479 discussed above.[43] Putting that gloss on § 1396a(p)(1) aside for the moment, the opinion also says, “[t]o be sure, the general grounds for termination invoked by LDHH — fraud, misrepresentations, and investigations — might well relate to a provider’s qualifications. States undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance.”[44] The opinion notes that “Medicaid’s 42 U.S.C. § 1396a(p)(1)’s exclusionary provision makes that clear.”[45] The opinion then proceeds to determine, on the merits, that none of the grounds given by LDHH for terminating PPGC’s provider agreement are “authorized by § 1396a(p).”[46] The majority opinion errs not only in permitting Medicaid recipients to litigate whether a provider is qualified, but also in incorrectly analyzing the grounds LDHH identified for its proposed termination of PPGC’s provider agreements.
The letter informing PPGC of LDHH’s intent to terminate its Medicaid provider agreements included several independent grounds for termination. One was that PPGC had filed false Medicaid or Medicare claims. LDHH’s stated bases for believing that PPGC had done so were provider audits, settlement of a federal False Claims Act suit, and an opinion and order in a federal False Claims Act case pending at the time, in which the court said that it could draw a reasonable inference from the Complaint in that case that PPGC had knowingly filed false claims. LDHH’s letters to PPGC stated:
Also under consideration in our departmental proceedings are provider audits and federal false claims cases against Planned Parenthood of America (PPFA) affiliates. Included among these are pending federal false claims cases against PPGC, one in which the presiding judge found that the information already provided “allows the court to draw the reasonable inference that Planned Parenthood knowingly filed false claims.” Memorandum Opinion and Order at 17, Carroll v. Planned Parenthood Gulf Coast, 4:12-cv-03505 (S.D. TX, Houston Div.) (May 14, 2014). Providers and providers-in-fact are required to ensure that all their agents and affiliates are in compliance with all federal and state laws as well as rules, policies and procedures of the Medicaid program.
The panel’s majority opinion gives short shrift to this ground for termination. The opinion states that “[a]t the most, LDHH has simply pasted the labels of ‘fraud’ and ‘misrepresentations’ on PPGC’s conduct.” [47] However, LDHH contemplated that there would be administrative proceedings following the letters that expressed its intent to terminate PPGC’s provider agreements. The notice letters each advised in their opening paragraph that termination would take effect only *480 after “final determination, judgment, completion, withdrawal from, or termination of all administrative and/or legal proceedings in this matter. Such proceedings include, but are not limited to, informal hearings, administrative appeals, appeals for judicial review, appellate judgments, and/or denials of writ applications.” But, as the majority opinion repeatedly recognizes,[48] there was never even an informal hearing at which evidence would be presented because PPGC declined to participate in any administrative proceedings at all.
In any event, at least some of LDHH’s grounds for termination were within the scope of the federal statutes and regulations that permit a State to terminate a provider’s Medicaid agreement for fraud or improprieties in billing practices. Details of alleged fraud and' improper billing practices were contained in the settlement agreement described in LDHH’s notices of termination, which was PPGC’s settlement of a federal False Claims Act suit initiated by Karen Reynolds, a former PPGC former employee.[49] The allegations in that suit were serious and included assertions that over a five-and-a-half-year period, PPGC had submitted false claims for medically unnecessary or unneeded items and services, and items and services that were never provided by PPGC. PPGC paid $4,300,000 to settle that suit. The settlement agreement reflects that both the United States and the State of Texas asserted claims against PPGC for fraud in addition to those alleged by the Qui-Tam plaintiff.[50] Though the settlement agreement reflects that PPGC did not admit liability, the agreement memorializes that (1) PPGC agreed to wire transfer to the United States $4,300,000, (2) the United States agreed to pay $1,247,000 of the $4,300,000 to the Qui-Tam plaintiff, (3) the United States paid $500,831 to the State of Texas “which is the Medicaid portion of the Settlement Amount, less Texas’ portion of the [Qui-Tam plaintiffs] Share,” (4) the balance was retained by the United States Government, and (5) PPGC agreed *481 to pay the Qui-Tam plaintiffs attorney’s fees and attorney’s costs in a separate ■written settlement agreement with the Qui-Tam plaintiff. The settlement expressly reserved the rights of the United States and the State of Texas to maintain administrative actions to exclude PPGC from federal health care programs, including Medicare.
The fact that PPGC settled these claims with a disclaimer that it was not admitting liability does not make the factual allegations contained in the settlement agreement disappear. If true, any one of the allegations set forth in the settlement agreement would have been grounds for LDHH’s termination of PPGC’s Medicaid provider agreements.
The district court proceeded to rule, on the merits, that LDHH had previously analyzed the claims in the Reynold’s suit and did not think they had much credence.[51] Even if, ultimately, that is shown to be true, the point is that the district court examined grounds that at least facially were adequate for termination under § 1396a(p)(1), but concluded that, on the merits, those grounds were not likely to prevail.
Both the district court, and the panel’s majority opinion, permit the Individual Plaintiffs to challenge LDHH’s determination that PPGC is not a “qualified” provider under the Medicaid statutes and regulations. In so doing, both courts have failed to adhere to O’Bannon, which held that when a State concludes that a provider is not qualified, even if that determination is erroneous, a Medicaid recipient does not have a right by virtue of 42 U.S.C. § 1396a(a)(23) that can be vindicated by a § 1983 suit.
C
The majority opinion concludes that there is a “determinative distinction between this case and O’Bannon” and that “this distinction ... makes O’Bannon fully inapplicable.”[52] The distinction, the majority opinion asserts, is that in O’Bannon, “the Supreme Court held that none of [the nursing home’s] former clientele — implicitly, whether covered by Medicaid or commercial insurance — had standing to advance constitutional claims because they were only affected incidentally,” and in O’Bannon, “the state decertified the medical provider totally for failure to meet statutory and regulatory requirements for certification as a skilled nursing facility.”[53] Two premises in this assertion are incorrect.
1
The opinion in O’Bannon does not say that the nursing home facility was “totally” prohibited from providing care to any nursing home resident. The facility was decertified as a Medicaid provider, not prohibited from operating as a nursing home.[54]
Specifically, as to the factual underpinnings of O’Bannon, there is no indication in the Supreme Court’s opinion that “de-certification” of the nursing home under the Medicaid statutes required it to cease providing nursing home care to patients *482 who were not Medicaid beneficiaries. The Supreme Court’s opinion reflects that the nursing home had first been certified in 1967 by the Department of Health, Education, and Welfare (HEW) as a “skilled nursing facility,” which made it eligible to enter into one-year Medicare and Medicaid provider agreements with HEW and the Pennsylvania Department of Public Welfare (DPW).[55] The home “was decertified in 1974 as a result of substantial noncompliance with both state and federal requirements,” [56] but in 1976, it was recerti-fied by HEW.[57] In 1977, HEW once again decertified the nursing home under the Medicaid statutes, and HEW and DPW once again decided not to renew the nursing home’s one-year Medicaid provider agreements due to failure to meet statutory and regulatory standards for skilled nursing homes.[58] There is no indication in O’Bannon, the Court of Appeals’ decision that it reversed,[59] or the briefing in the Supreme Court,[60] that the nursing home was prohibited from providing services to residents who were not Medicaid or Medicare beneficiaries as the majority opinion in the present case posits, and therefore that the home was required to cease operations “totally,”[61] during the interim between 1974 and 1976, or when the home was again decertified in 1977.
The O’Bannon opinion reflects that in response to the 1977 decertification, six Medicaid recipients sued to challenge that determination and the termination of the nursing home’s Medicaid provider agreements.[62] Their “complaint alleged that termination of the [Medicaid] payments would require [the nursing home] to close,”[63] not that the nursing home had lost its license or had been closed by the State. The home was in jeopardy of closing due to economic factors, since so many of its residents (approximately 180 of 198) were Medicaid recipients,[64] not because the home had been “decertified ... totally”[65] by State or federal agencies, as the majority opinion in the present case asserts repeatedly.[66] Whether the nursing *483 home facility in O’Bannon was required to cease operations had no bearing on the Supreme Court’s holding that 42 U.S.C. § 1396a(a)(23) is not a font of substantive rights flowing to Medicaid patients that permits them to sue to set aside the termination of a provider’s Medicaid or Medicare agreements on the basis that the provider failed to comply with certain statutory or regulatory requirements.
The majority opinion in the present case admits that it is on shaky ground in asserting that “decertification” in O’Bannon meant complete closure of the home by order of the State. The panel’s opinion hedges, saying, “[ajlthough, the opinion in O’Bannon does not expressly state whether the state’s decertification of the facility caused it to go out of business entirely, we are satisfied that decertification had a crippling effect on the institution even if it did not cause it to shut down totally.”[67] To what statutory language in 42 U.S.C. § 1396a(a)(23) is “a crippling effect on the institution” pertinent? What language in § 1396a(a)(23) differentiates between instances in which termination of a provider’s Medicaid agreement results in a “total[ ]”[68] closure of a facility (or a “crippling effect”)[69] and termination of a Medicaid agreement having little impact on the facility’s operations? Nothing in the Supreme Court’s decision in O’Bannon even alludes to such a distinction. The Court’s reasoning and its holding in O’Bannon would have been the same had the termination of the Medicaid provider agreements in that case affected only a few residents. The residents who sued in O’Bannon, all Medicaid beneficiaries, would have had the same arguments that they made in the Supreme Court. They would have been required to move as a result of the decerti-fication, even if scores of other residents (who did not receive Medicaid benefits) remained in the nursing home.
2
Nor was O’Bannon decided on standing principles applicable to nursing home residents generally. The question before the Court was whether 42 U.S.C. § 1396a(a)(23) gave Medicaid beneficiaries “a right to continued residence in the home of one’s choice.”[70] The issue actually decided was not whether a resident of a nursing home whose care is paid for by private funds has standing to contest a State’s closure of the home. As just noted, the State did not require the home to be closed, and the legal question before the Court was whether Medicaid beneficiaries could contest the termination of the nurs *484 ing home’s Medicaid provider agreements by state and federal agencies. The focus of the Supreme Court’s decision in O’Bannon was the extent of rights granted by the Medicaid and Medicare statutory provisions.[71] The Supreme Court’s construction of 42 U.S.C. § 1396a(a)(23) applies in the present case.
D
The panel’s majority opinion says that it will not follow O’Bannon because “[r]ead-ing O’Bannon to foreclose every recipient’s right to challenge a disqualification decision would render the right guaranteed by § 1396a(a)(23) nugatory.”[72] First and foremost, this court is not free to disregard the Supreme Court’s holding in O’Bannon, which was that § 1396a(a)(23) does not give a Medicaid recipient the right to challenge a determination that a provider is unqualified.[73] Second, O’Ban-non’s holding does not render rights under § 1396a(a)(23) “nugatory.” The Supreme Court held that § 1396a(a)(23) “confers an absolute right to be free from government interference with the choice” to receive services from a qualified provider.[74] Under § 1396a(a)(23)(A), “any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required, ... who undertakes to provide him such services,” and under § 1396a(a)(23)(B), the systems and entities specified “shall not restrict the choice of the qualified person from whom the individual may receive services,” with certain limitations.
That Medicaid recipients do not have a right to challenge a State’s decision that a particular provider is unqualified does not mean that the State’s decision is unreviewable. In the present case, for example, the provider, PPGC, had the right to challenge the termination of its provider agreements in state administrative proceedings.[75] It did not do so. However, in the federal district court proceedings, PPGC has asserted constitutional violations and may also have a § 1983 claim based on rights under provisions of the Medicaid statutes and regulations (other than § 1396a(a)(23) and regulations promulgated under it) to challenge the State’s termination of its provider agreement. Even if PPGC is limited to state administrative proceedings and state-court review, which is doubtful, that is not a basis for construing § 1396a(a)(23) to allow PPGC’s patients to challenge the State’s termination of PPGC’s provider contracts when the Supreme Court has held that § 1396a(a)(23) does not permit them to do so.
The argument that § 1396a(a)(23) should be construed to give patients a right to contest a State’s termination of a provider’s Medicaid agreement for cause is also undermined by the fact that § 1396a(a)(23) assumes a willing provider who “undertakes to provide ... such services” to the Medicaid recipient. In instances in which a provider does not challenge the termination of its Medicaid *485 agreement, it cannot be said to be undertaking to provide Medicaid services to its patients. The Medicaid statutory scheme contemplates that only the provider can contest a determination that it is not qualified. There is no need to give Medicaid patients that right. If the provider is successful in its challenge (as PPGC may ultimately be in the present case when its claims are addressed) and a State were to then seek to prevent patients from seeking treatment or services from that qualified provider, patients could sue based on § 1396a(a)(23).
I submit that the majority opinion has created a right to remedy what it perceives to be a violation of law by the State of Louisiana. But ends do not justify means, and any violation of law by the State can be remedied.
Ill
The majority opinion relies upon decisions from the Seventh and Ninth Circuits that permitted patients to challenge state laws that excluded Planned Parenthood from providing health-care services to recipients of state-administered funds unless Planned Parenthood ceased performing privately funded, legal abortions.[76] The purpose of the state laws at issue in those two cases was to prevent indirect subsidization of abortion.[77] In neither case did the State assert that the provider had settled False Claims Act suits, made misrepresentations, or was under investigation. In any event, the reasoning of those decisions is contrary to O’Bannon and is undermined by the recognition in those opinions that there are many circumstances in which a State may terminate a provider’s Medicaid provider agreement and yet the provider’s patients would be unable to sue to challenge those terminations.[78]
The majority opinion in the case before us today cites the Sixth Circuit’s decision in Harris v. Olszewski.[79] But that decision does not support the majority opinion’s conclusion that in some circumstances, a patient may challenge a determination that a provider is not “qualified” to provide services. In Harris, as a cost-savings measure, the State, contracted with a sole provider of incontinence products after a competitive-bidding process.[80] A Medicaid benefits recipient filed suit seeking to certify a class and to enjoin enforcement of the single-source-provider contract.[81] There'was no contention that other providers were unqualified; the Medicaid recipients sought to obtain supplies from other qualified providers.[82] The Sixth Circuit concluded that the patients had a right arising from § 1396a(a)(23) to bring a § 1983 claim.[83] That conclusion is entirely consistent with O’Bannon, which held that under § 1396a(a)(23), “a patient has a right to continued benefits to pay for care in the qualified institution of his choice.”[84]
*486 Nevertheless, the Sixth Circuit denied the requested relief, ultimately holding that the “single-source contract for incontinence products complied with statutory and regulatory requirements for an exemption to the freedom-of-choice provision.” [85]
IV
The majority opinion observes that because § 1396a(a)(23) “speaks only in terms of recipients’ rights rather than providers’ rights,” “the right guaranteed by § 1396a(a)(23) is vested in Medicaid recipients rather than providers.”[86]I agree with that observation and the majority opinion’s conclusion that providers “cannot bring a challenge pursuant to § 1396a(a)(23).”[87] However, as discussed above, a provider has other avenues to seek redress when a State terminates its status as a qualified provider for purposes of Medicaid.
⅜ ⅜ ⅜
The State of Louisiana may have improperly terminated PPGC’s Medicaid provider agreements, and if so, PPGC may pursue remedies. However, the Supreme Court, has held that when a State determines that a particular provider is not qualified to provide Medicaid services, a patient has no life, liberty, or property interest under 42 U.S.C. § 1396a(a)(23) that is implicated or affected.[88] Because the majority opinion has created patients’ rights that are not found in § 1396a(a)(23)’s text and because the majority opinion fails to follow the Supreme Court’s decision in O’Bannon, I must dissent.

. 447 U.S. 773, 775-77, 785, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).

. Id. at 786, 100 S.Ct. 2467.

.42 U.S.C. § 1396a(a)(23) provides:
(a) Contents
A State plan for medical assistance must—
[[Image here]]
(23) provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services, and (B) an enrollment of an individual eligible for medical assistance in a primary care case-management system (described in section 1396n(b)(l) of this title), a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title, except as provided in subsection (g) of this section, in section 1396n of this title, and in section 1396u-2(a) of this title, except that this paragraph shall not apply in the case of Puerto Rico, the Virgin Islands, and Guam, and except that nothing in this paragraph shall be construed as requiring a State to provide medical assistance for such services furnished by a person or entity convicted of a felony under Federal or State law for an offense which the State agency determines is inconsistent with the best interests of beneficiaries under the State plan or by a provider or supplier to which a moratorium under subsection (kk)(4) is applied during the period of such moratorium^]

. 447 U.S. at 775-76, 100 S.Ct. 2467.

. Id. at 775, 100 S.Ct. 2467.

. Id. at 785, 100 S.Ct. 2467.

. Id.

. Id. at 777, 100 S.Ct. 2467.

. Id. at 785-86, 100 S.Ct. 2467.

. Id. at 775, 785, 100 S.Ct. 2467.

. Ante at 460.

. O’Bannon, 447 U.S. at 787, 100 S.Ct. 2467.

. U.S. Const. amend. XIV, § 1.

. Ky. Dep’t of Corr. v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) ("We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.” (citations omitted) (citing Hewitt v. Helms, 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) and Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972))).

. O’Bannon, 447 U.S. at 777, 100 S.Ct. 2467.

. See Thompson, 490 U.S. at 460, 109 S.Ct. 1904.

. O’Bannon, 447 U.S. at 784, 100 S.Ct. 2467.

. Id. ("The patients have identified two possible sources of such a right.”); id. at 784-85, 100 S.Ct. 2467 (discussing 42 U.S.C. § 1396a(a)(23) as one of the identified sources).

. Id. at 785, 100 S.Ct. 2467.

.Id. at 784, 100 S.Ct. 2467.

. Id. at 786, 100 S.Ct. 2467.

. But see Planned Parenthood of Ind., Inc. v. Comm’r of Ind. State Dep’t of Health, 699 F.3d 962, 977 (7th Cir. 2012) (distinguishing O’Bannon on the basis that "the free-choice-of-provider statute was raised in the context of a due-process claim” and that "[t]his is not a due-process case”).

. Ante at 461.

. Ante at 472.

.See infra Part 11(C)(1).

. Ante at 469 (“To be sure, the general grounds for termination invoked by LDHH— fraud, misrepresentations, and investigations — might well relate to a provider's qualifications. States undoubtedly must be able to terminate provider agreements in cases of criminal activity, fraud and abuse, and other instances of malfeasance. Medicaid’s 42 U.S.C. § 1396a(p)(1)'s exclusionary provision makes that clear.... It bears repeating, however, that LDHH has taken no action to revoke PPGC’s license and has not called into question any qualification that enables PPGC to offer medical care generally.”); see also ante at 470 (“We repeat yet again for emphasis that LDHH has never once complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC's entitlement to render medical services to the general population, for example, by revoking its license.”); ante at 470 ("LDHH would deny PPGC’s services only to Medicaid recipients while leaving all other individuals free to obtain the very same services from PPGC.”).

. See 42 U.S.C. § 1396a(p)(1) ("In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this sub-chapter for any reason for which the Secretary could exclude the individual or entity from participation in a program under sub-chapter- XVIII of this chapter under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title.”); § 1320a-7(b)(6) (permitting exclusion for excessive charges or unnecessary services); § 1320a-7(b)(7) (permitting exclusion for "an act which is described in section 1320a-7a, 1320a-7b, or 1320a-8 of this title”); id. § 1320a-7a(a)(1)(A) (presenting a claim "for a medical or other item or service that the person knows or should know was not provided as claimed”).

. Ante at 461.

. See 42 U.S.C. §§ 1396a(p)(1)-(3), 1320a-7, 1395cc(b)(2).

. Id. § 1320a-7(b).

. § 1320a-7(b)(6).

. § 1320a-7(b)(7).

. § 1320a-7(b)(9)-(11).

. § 1320a-7(b)(12).

. § 1320a — 7(b)(14).

. § 1320a — 7(b)(16).

. Ante at 461.

. See 42 U.S.C. §§ 1396a(p), 1320a-7(b)(6).

. Ante at 461.

. Ante at 461.

. Ante at 465.

.See ante at 465:
While as a general rule a state may terminate a provider's Medicaid agreements for reasons bearing on that provider’s general qualification to provide medical services, we are not aware of any case that holds a state may do so while continuing to license a provider’s authorization to offer those same services to non-Medicaid patients. “Qualified” means "to be capable of performing the needed medical services in a professionally competent, safe, legal, and *479 ethical manner.” States may also exclude providers on the grounds provided by 42 U.S.C. § 1396a(p)(l) and on analogous state law grounds relating to a provider’s qualification. Although states retain broad authority to define provider qualifications and to exclude providers on that basis, their authority is circumscribed by the meaning of "qualified” in this context, (footnote omitted) (quoting Planned Parenthood of Ind., Inc. v. Comm’r of Ind. State Dep’t of Health, 699 F.3d 962, 978 (7th Cir. 2012)).

. See supra Part 11(B)(1).

. Ante at 469.

. Ante at 469.

. Ante at 465-66.

. Ante at 469.

. See, e.g., ante at 453 ("PPGC has not requested either a hearing or an administrative appeal.”).

. ROA 498, 727.

. The settlement agreement recites:
D. The United States contends that PPGC submitted false claims and made false statements to the United States in connection with claims that PPGC submitted to the United States under the Social Security Block Grant, Tide XX of the Social Security Act, 42 U.S.C. §§ 1397 et seq. (SSBG), the Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. (Medicaid Program), and the Women’s Health Program (WHP), a Medicaid research and demonstration waiver created under Section 1115(a) of the Social Security Act, 42 U.S.C. § 1315(a), and implemented by Texas under former Tex. Hum. Res. Code § 32.0248.
E. Texas contends that PPGC submitted false claims and made false statements to Texas in connection with claims that PPGC submitted to Texas under the Medicaid Program and WHP in violation of the TMFPA, Tex. Hum. Res. Code. Ann. § 36.001 et seq.
F.The Government contends that it has certain civil and administrative claims, as specified in Sections III.B, III.C, and III.E below, against PPGC for engaging in the following conduct:
submission of claims for payment to the United States and the State of Texas during the time period between July 30, 2003, through February 28, 2009, through the Medicaid Program, SSBG, and WHP when such items and services were (i) medically unnecessary or not medically indicated; (ii) not actually provided by PPGC; or (iii) improperly documented in patient charts as being provided even though they had not been performed. Covered Conduct is further limited to claims based on the following Current Procedural Terminology ("CPT”) and local codes ... [detailed listing of codes and terminology omitted in this opinion in the interest of brevity].

.The district court wrote that "Plaintiffs have credibly shown that DHH was aware of the Reynolds Settlement long before October 14, 2015, with Defendant’s own emails suggesting that it did not find it sufficient to provide “credible evidence” of Medicaid fraud.”

. Ante at 472.

. Ante at 472 (emphasis added).

. See O’Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 775-76 & nn.2-3, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).

. Id. at 775 & n.1, 100 S.Ct. 2467.

. Id. at 775 n.1, 100 S.Ct. 2467.

. Id. at 775, 100 S.Ct. 2467.

. Id. at 775-76, 100 S.Ct. 2467.

. Town Court Nursing Ctr., Inc. v. Beal, 586 F.2d 280 (3d Cir. 1978), rev’d sub nom. O’Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).

. Brief for Petitioner, O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (No. 78-1318), 1979 WL 213543; Brief for Respondents, O’Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (No. 78-1318), 1979 WL 199370; Brief for the Secretary of Health, Education, and Welfare, O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (No. 78-1318), 1979 WL 199369.

. See ante at 472.

. O’Bannon, 447 U.S. at 777, 100 S.Ct. 2467.

. Id. (emphasis added).

. See id. at 775-77, 777 n.5, 100 S.Ct. 2467 (recounting that Town Court operated a 198-bed facility and six Medicaid recipients residing in the facility "filed their action on behalf of a class of all Medicaid recipients in the home, [though] the District Court never certified the class,” while framing the question for decision as “whether approximately 180 elderly residents of a nursing home operated by Town Court Nursing Center, Inc., have a constitutional right to a hearing before a state or federal agency may revoke the home’s authority to provide them with nursing care at government expense”).

. Ante at 472.

. See, e.g., ante at 460 (“[O’Bannon] is inap-posite. There, the patient-plaintiffs’ injuries were alleged to stem from a deprivation of due process rights, specifically, the right to a *483 hearing to contest the state's decertification of a health care provider, not just its Medicaid qualification.”); ante at 461 (“This case is different [from O’Bannon]. Louisiana has never complained that PPGC is not competent to render the relevant medical services, and it has taken no independent action to limit or terminate PPGC’s entitlement to render medical services to the general population, for example, by revoking its license.”); ante at 469 (“It bears repeating, however, that LDHH has taken no action to revoke PPGC’s license and has not called into question any qualification that enables PPGC to offer medical care generally.”); ante at 472 ("[T]he institution in O’Bannon was decertified for reasons having to do with the quality of care provided to patients. Here, the state has not impugned the quality of PPGC’s care, and it will continue in business: Only its Medicaid patients will be prevented from receiving treatment there. The dissent cannot avoid this distinction, which makes O’Bannon fully inapplicable.”).

. Ante at 472.

. Ante at 472.

. Ante at 472.

. O’Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 785, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).

.See id. ("Whether viewed singly or in combination, the Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in the home of one’s choice. Title 42 U.S.C. § 1396a(a)(23) (1976 ed., Supp.II) gives recipients the right to choose among a range of qualified providers, without government interference.”); id. at 785-90, 100 S.Ct. 2467.

. Ante at 460.

. O’Bannon, 447 U.S. at 785, 100 S.Ct. 2467.

. Id.

. See La. Stat. Ann. § 46:437.4; La. Admin. Code tit. 50, §§ 4161, 4211, 4213.

. Ante at 458-60 (citing Planned Parenthood Ariz., Inc. v. Betlach, 727 F.3d 960 (9th Cir. 2013) and Planned Parenthood of Ind., Inc. v. Comm’r of Ind. State Dep’t of Health, 699 F.3d 962 (7th Cir. 2012)).

. See, e.g., Planned Parenthood of Ind., 699 F.3d at 967 ("The point is to eliminate the indirect subsidization of abortion.”).

. See Betlach, 727 F.3d at 973; Planned Parenthood of Ind., 699 F.3d at 979.

. Ante at 458, 459-460 (citing Harris v. Olszewski, 442 F.3d 456 (6th Cir. 2006)).

. Harris, 442 F.3d at 460, 463.

. Id. at 460.

. Id.

. Mat 459.

. O’Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 786, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980).

. Harris, 442 F.3d at 467, 468-69 (concluding that the State had not violated the freedom-of-choice provision contained in 42 U.S.C. § 1396a(a)(23) because of the statutory exception found in 42 U.S.C. § 1396n(a)(1)(B)).

. Ante at 459-60.

. Ante at 459-61. But see Planned Parenthood Ariz., Inc. v. Betlach, 727 F.3d 960, 965-67 (9th Cir. 2013) (concluding that Planned Parenthood had stated a cause of action under § 1983 based on rights conferred by § 1396a(a)(23)); Planned Parenthood of Ind., Inc. v. Comm’r of Ind. State Dep’t of Health, 699 F.3d 962, 972-77 (7th Cir. 2012) (drawing no distinction between Planned Parenthood and its patients in concluding that there is an individual right to sue arising from § 1396a(a)(23)).

. O’Bannon, 447 U.S. at 785-87, 100 S.Ct. 2467.